STEVE LARSON, Plaintiff-Appellant v. CSX TRANSPORTATION, INC., Defendant-Appellee.

First District (6th Division)   No. 1—04—1219

Opinion filed August 19, 2005.

Kent M. Lucaccioni, of Kent M. Lucaccioni, Ltd., of Chicago, for appellant.

Brasher Law Firm, L.C., of St. Louis, Missouri, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

Steven C. Larson brought an action under the Federal Employers' Liability Act (FELA) (45 U.S.C. §§ 51 through 59 (2000)), against CSX Transportation, Inc. (CSXT), for damages for carpal tunnel syndrome allegedly incurred in the course of his employment. The trial court granted defendant's motion for summary judgment. Larson appeals. Because no genuine issue of fact exists as to whether Larson was an employee of CSXT for FELA purposes at the time of his injury, we now affirm.

## BACKGROUND

The facts underlying the instant appeal are largely undisputed. In 1987, Larson was employed by Fruit Growers Express (FGE) as a carman. FGE provides inspection and repair services for the refrigerated railroad cars of various railroad customers, and Larson's primary responsibility as a carman was the repair of internal components of these refrigerated cars. In 1992, Larson was promoted to supervisor in charge of car cleaning and repair, but he retained active responsibility for refrigerated car repair.

Larson customarily began his work day with a mechanical inspection of the cars of CSXT, a common carrier by rail, at the railroad's

yard. The railroad's yardmaster would inform Larson which cars needed to be inspected and where they were located within the yard. If a railcar failed its inspection, Larson would call the yardmaster and request that the car be set out for repair. Before making repairs to railcars, Larson obtained both verbal and written permission from CSXT's yardmaster. If any refrigerated cargo seemed to be at risk of loss, Larson also called CSXT's freight claims department. That department determined what to do in the event that a car could not be immediately repaired and its load was at risk: have the car transferred for repair, have the load transferred, or run the car to the destination.

Larson sought similar direction from employees of railroads other than CSXT when performing work on their cars. Though he generally began each day doing inspections at the CSXT yard, he checked his answering machine each morning for service calls that had come in over the previous night, he was free to set his own schedule and priorities, and he always gave priority to calls for service on cars whose loads were at risk of loss without regard to the railroad that utilized them. Larson would occasionally do additional work for CSXT cars which he did not do for the cars of other railroads, such as lubing the doors.

In 1989, FGE was purchased in its entirety by Rail Wagons, Incorporated, a wholly owned subsidiary of CSXT. Approximately 90% of FGE's revenue was derived from billings for work done on CSXT cars. The administrative functions of FGE, including payroll services, were performed by CSXT pursuant to contract. Larson's immediate supervisor at FGE was B.J. Mackey. B.J. Mackey's supervisor at FGE was James Crisp, who reported directly to an assistant vice president of CSXT, David Bell.

FGE supplied all the necessary tools for Larson to complete his work; however, at least some of the vehicles used by FGE employees were leased from CSXT. A boom truck leased by FGE and used by Larson had a CSXT emblem stenciled on its door, but the pickup truck that Larson drove to and from work sites did not have any identification on its exterior. The vehicles were given identification numbers which corresponded with numbers on credit cards which were to be used by FGE employees to refuel them; the credit cards had CSXT emblems printed on them; however, the funds used to satisfy the credit cards come out of an FGE account.

Larson filed a complaint against CSXT in the circuit court of Cook County, alleging that he had initially developed symptoms of carpal tunnel syndrome in 1995; that the symptoms returned in 1997 and that he was diagnosed with the condition at that time; that he

underwent surgeries for the condition in March and April 2000; and that he remained disabled as a result of the condition. Larson further claimed that he was loaned by FGE to CSXT, that FGE was the servant of CSXT, that he was therefore an employee of CSXT for purposes of the Federal Employers' Liability Act (41 U.S.C. §§ 51 through 59 (2000)), and that his condition was a result of CSXT's negligence in requiring him to use equipment that caused the condition and in failing to provide him with equipment that would have allowed him to avoid repetitive stressful motions.

CSXT denied the substance of Larson's complaint and filed a motion for summary judgment, contending that the pleadings, depositions and admissions show that Larson was not employed by CSXT for FELA purposes or otherwise. The trial court granted CSXT's motion. Larson appeals.

## ANALYSIS

■ The sole issue on appeal is whether summary judgment was properly granted to CSXT on the ground that Larson was not an "employee" of CSXT for FELA purposes at the time of his injury. "Federal substantive law applies to actions brought under FELA." *Tierney v. Burlington Northern R.R. Co.*, 240 Ill. App. 3d 526, 529 (1992), citing *Dice v. Akron, Canton & Youngstown R.R. Co.*, 342 U.S. 359, 96 L. Ed. 398, 72 S. Ct. 312 (1952). Decisions of federal courts control our interpretation of federal statutes. *Elgin, Joliet & Eastern Ry. Co. v. Industrial Comm'n*, 9 Ill. 2d 505, 507 (1956).

Summary judgment shall be entered when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. "In determining the existence of a genuine issue of material fact, courts must consider the pleadings, depositions, admissions, exhibits, and affidavits on file in the case and must construe them strictly against the movant and liberally in favor of the opponent." *Buccieri v. Illinois Central Gulf R.R.*, 235 Ill. App. 3d 191, 196 (1992). Courts review the propriety of summary judgment *de novo. Buccieri*, 235 Ill. App. 3d at 196. When the plaintiff fails to present evidence to create a genuine issue of material fact on the question of his employment by the defendant for FELA purposes, summary judgment for the defendant is proper. *Dominics v. Illinois Central R.R. Co.*, 934 F. Supp. 223, 226-27 (S.D. Miss. 1996).

In order to establish a cause of action under FELA, a plaintiff must prove the following four elements: (1) defendant is a common carrier; (2) plaintiff was an employee of the common carrier; (3) plaintiff's injury was sustained while employed by the common carrier; and (4) defendant's negligence is the cause of the injuries. 45 U.S.C. § 51 (2000).

■ Larson concedes that he was nominally employed by FGE, which is not a party to the instant appeal and is not a common carrier for FELA purposes. *Edwards v. Pacific Fruit Express Co.*, 390 U.S. 538, 543, 20 L. Ed. 2d 112, 116, 88 S. Ct. 1239, 1242 (1968). Plaintiffs nominally employed by non-FELA entities may nonetheless recover from railroad defendants under the statute under any one of three circumstances: (1) plaintiff is a borrowed servant of the railroad; (2) plaintiff works for two employers (his own and the railroad) simultaneously; or (3) plaintiff's employer is a servant of the railroad and, thus, plaintiff is a "subservant" of the railroad. *Kelley v. Southern Pacific Co.*, 419 U.S. 318, 324, 42 L. Ed. 2d 498, 506, 95 S. Ct. 472, 476 (1974). Larson contends that he has presented sufficient evidence to reach the jury on each of the possible theories of recovery against CSXT. We disagree.

### "Borrowed" or "Dual Servant" Theory

■ Larson argues that he is a "borrowed servant" or a "dual servant" of CSXT and is thus entitled to recover from the railroad under FELA. "Under the 'borrowed servant' doctrine, one master enters into an agreement with a second by which the second (for example) borrows the servants of the first. The borrowing master thus becomes the borrowed servant's master while the borrowed servant is performing the borrowing master's tasks." *Pelliccioni v. Schuyler Packing Co.*, 140 N.J. Super. 190, 197-98, 356 A.2d 4, 8 (1976), citing *Linstead v. Chesapeake & Ohio Ry. Co.*, 276 U.S. 28, 72 L. Ed. 453, 48 S. Ct. 241 (1928); *Williams v. Louisville & National R.R. Co.*, 398 F. Supp. 683 (S.D. Ohio 1975); *Helton v. United States*, 309 F. Supp. 479, 484 (E.D. Ark. 1969). The "dual servant" situation arises when "two employers share equally in the direct supervision and control of one servant." *Pelliccioni*, 140 N.J. Super. at 198, 356 A.2d at 8, citing 1 Restatement (Second) of Agency § 226, at 498 (1958). At the center of the analysis for both the borrowed servant theory and the dual servant theory is the question of control. *Kelley*, 418 U.S. at 325-26, 42 L. Ed. 2d at 506-07, 95 S. Ct. at 476-77. The control necessary to establish the plaintiff's status as the defendant's servant is the latter's significant supervisory role over the means and manner of the plaintiff's performance; global oversight is insufficient, as is cooperation and consultation in coordinated operations. *Ancelet v. National R.R. Passenger Corp.*, 913 F. Supp. 968, 971 (E.D. La. 1995).

To support his claim of control Larson points to the following: (1) he was instructed to "do certain things with certain types of cars"; (2) CSXT foremen would instruct him where to work at the yard; (3) he communicated directly with the CSXT freight claims department about

specific problems with cars, accompanied by instructions as to whether/how to repair the car; and (4) he would have to get permission to work on certain repairs in the yard.

In *Ancelet*, similar facts were held to be insufficient to require the submission to the jury of the plaintiff's status as an employee of a railroad for FELA purposes. There, the plaintiff, a pest-control technician, claimed that he was a borrowed servant of the defendant railroad and established that: (1) the railroad foremen told him what time to report to the yard; (2) the railroad foremen told him the location and priority of the cars to be treated; (3) the railroad foremen told him what type of problem was to be treated; and (4) occasionally the foremen would tell him what type of treatment was desired. 913 F. Supp. 968 at 972. The railroad did not dispute these facts but argued that these instructions were necessary to inform the plaintiff of the location and type of work to be done. 913 F. Supp. at 972. The district court found that these facts did not demonstrate the railroad's control over the plaintiff: "[T]he nature of the pest control business required interaction between technician and customer, as well as some direction by the customer. Without such communication, the customer could not alert the technician to specific problems that the customer was experiencing." 913 F. Supp. at 972. The *Ancelet* court found the direction from the defendant railroad to the plaintiff to be "cooperation and consultation," rather than control (913 F. Supp. at 973), and concluded that there was "no material fact issue that [the defendant] did not exercise the requisite control to make [plaintiff] its borrowed employee" (913 F. Supp. at 974).

In review of FELA claims by plaintiffs nominally employed by nonrailroad entities, federal courts have held that in addition to the crucial factor of control, other factual elements may be relevant to a determination of the existence of a master-servant relationship: whose work is being performed; the existence of any agreements reflecting a "borrowing" arrangement between the railroad and the nominal employer; the employee's acquiescence in the new work situation; the employee's termination of his relationship with his original employer; who furnished the tools and the place for the work; length of employment; who had the right to discharge the employee; and who had the obligation to pay the employee. *Ancelet v. National R.R. Passenger Corp.*, 913 F. Supp. 968, 970-71 (E.D. La. 1995). In the instant case, we believe that the evidence of record regarding these factors fails to create a dispute of fact requiring jury resolution of Larson's claim of employment by CSXT. We consider it noteworthy that refrigerated railcar repair was a service performed by FGE for several railroad customers; that the record is devoid of evidence of any arrangement

which ceded authority over the details of Larson's employment from FGE to CSXT; that the evidence of record indicates that FGE furnished Larson's tools (including vehicles that FGE leased from CSXT); that those authorized to discipline and terminate Larson were James Crisp and B.J. Mackey, both FGE employees; and that Larson's salary was paid by FGE.

In support of his claim of the existence of a material issue of fact regarding his status as an employee of CSXT for FELA purposes, Larson cites *Lindsey v. Louisville & Nashville R.R. Co.*, 775 F.2d 1322 (5th Cir. 1985); *Buccieri v. Illinois Central Gulf R.R.*, 235 Ill. App. 3d 191 (1992); and *Kottmeyer v. Consolidated R. Corp.*, 98 Ill. App. 3d 365 (1981). Though in each case the evidence of railroad employment for FELA purposes was held sufficient to go to the jury, we believe that each case was decided upon a factual basis materially distinguishable from that in the case at bar.

In *Lindsey*, the plaintiff was employed as part of a crew that loaded and unloaded trailers on railcars, and he presented evidence that "when any questions arose concerning the work," he and his fellow employees checked with representatives of the railroad; that on some occasions the crews got "specific orders and instructions" from railroad employees; and that railroad workers inspected the crew in the "loading and positioning" of the trailers on the cars. *Lindsey*, 775 F.2d at 1323-24. In *Buccieri*, the plaintiff, a laborer, presented evidence that his nominal employer had no supervisory personnel at his work site and that railroad employees inspected his work and directed and oversaw the correction of any errors. *Buccieri*, 235 Ill. App. 3d at 200. Significantly, the plaintiff also presented evidence that his injury occurred when, while riding from one railroad yard location to another on the outside of a truck, he lost his grip and fell; the record demonstrated that railroad supervisors had directed members of the plaintiff's crew to travel around the yard on the outside of trucks in the manner which resulted in the accident. *Buccieri*, 235 Ill. App. 3d at 201. In *Kottmeyer*, the plaintiff, employed by a company which loaded and unloaded trailers from rail cars, presented evidence that railroad representatives sometimes directed employees of the plaintiff's company to speed up their work; that railroad employees instructed the loading company's workers "regarding changes in trailer loading"; and that railroad workers "exercised control over the conduct" of the loading company's employees. *Kottmeyer*, 98 Ill. App. 3d at 374.

It is thus apparent that in each of the cases cited by Larson, the defendant railroads exercised control over operational details of the plaintiffs' work and did not limit their communications to the

establishment of ultimate goals. In contrast to these cases, the record in the instant case offers no suggestion that any representative of CSXT sought in any way to direct Larson on the means and manner of performing repairs: Larson does not indicate that CSXT sought to dictate which tools he used, how to implement them, how to determine the success of a repair project, or any other operational detail of his work. In our view, this distinction illustrates the line of demarcation between evidence of the "means and manner" control sufficient to establish a master-servant relationship and evidence of mere cooperation, coordination, and direction of objectives, which is insufficient to subject a company other than the plaintiff's nominal employer to FELA liability. We conclude that Larson has failed to demonstrate the presence of a material issue of fact regarding his alleged status as a borrowed servant of CSXT or as a simultaneous servant of the railroad and FGE.

## Subservant Theory

Next, Larson argues that the corporate structure between FGE and CSXT creates a subservant relationship between the two sufficient to establish liability under FELA. In our view, the record contains insufficient evidence to require the submission of this theory of recovery to the jury.

To establish his status as a "subservant" of CSXT, Larson must demonstrate that FGE, his nominal employer, was a servant of the railroad. *Dominics*, 934 F. Supp. at 226. Examination of subservant claims, like the inquiry into borrowed and dual servant allegations, focuses on the issue of control, and federal courts have described the requisite measure of control as the right to control " 'the physical conduct in the performance of the services.' " *Dominics*, 934 F. Supp. at 226, quoting Restatement (Second) of Agency § 220(1) (1958). Having concluded that Larson has presented insufficient evidence of CSXT control over his work to require the submission of his status as a borrowed or dual servant of the railroad to the jury, we also conclude that the same evidence fails to create a jury question regarding Larson's claim that FGE was the railroad's servant.

## Alter Ego Theory

Larson further argues that the parent and subsidiary relationship between CSXT and FGE is so intimate that regarding them as two separate entities is a legal fiction. An identical allegation was reviewed by the Supreme Court of Kansas in *Doughty v. CSX Transportation, Inc.*, 258 Kan. 493, 905 P.2d 106 (1995). The *Doughty* court conducted an extensive analysis of the principles governing the imposition of alter ego liability under Kansas law: "[T]he fact that two

corporations may have stockholders or officers in common, that one is the parent of the other, that the parent selects from its own directors and officers the majority of the directors of the other, or that a parent finances a subsidiary is, without more, insufficient to warrant treating the two corporations as one. \*\*\* [W]here it is apparent the relationship between the parent and its subsidiary is so intimate, the parent's control over the subsidiary is so dominating, and the business and assets of the two are so mingled that the recognition of distinct entity would result in injustice to third persons, courts will look through the legal fiction of separate entities and treat them as justice requires." *Doughty*, 258 Kan. at 498, 905 P.2d at 110-11, citing *Schmid v. Roehm GmbH*, 544 F. Supp. 272, 275 (D. Kan. 1982). The *Doughty* court examined the CSXT-FGE relationship in light of 10 factors used by Kansas courts as guidelines in determining alter ego status: whether (1) the parent corporation owns all or a majority of the capital stock of the subsidiary; (2) the corporations have common directors or officers; (3) the parent corporation finances the subsidiary; (4) the parent corporation subscribed to all of the capital stock of the subsidiary or otherwise caused its incorporation; (5) the subsidiary has grossly inadequate capital; (6) the parent corporation pays the salaries or expenses or losses of the subsidiary; (7) the subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation; (8) in the papers of the parent corporation, and in the statements of its officers, the subsidiary is referred to as such or as a department or division; (9) the directors or executives of the subsidiary act independently in the interest of the subsidiary but take direction from the parent corporation; and (10) the formal legal requirements of the subsidiary as a separate and independent corporation are observed. *Doughty*, 258 Kan. at 498-99, 905 P.2d at 111, citing *Schmid*, 544 F. Supp. at 275. The court concluded that the "ultimate test" for the determination of alter ego status under Kansas law was whether the parent's control over the subsidiary was so dominating, the relationship between the two companies so intimate, and the business and assets of the two so intermingled that recognition of the subsidiary as a distinct entity would result in an injustice to third parties. *Doughty*, 258 Kan. at 500, 905 P.2d at 111. The *Doughty* court held that the plaintiff, an FGE employee seeking recovery under FELA, had produced insufficient evidence of an alter ego relationship between FGE and CSXT to survive the railroad's motion for summary judgment. 258 Kan. at 505, 905 P.2d at 114.

We find the *Doughty* court's analysis of the alter ego issue regarding FGE and CSXT to be persuasive. Illinois courts reviewing alter

ego allegations under both Illinois common law and in the context of FELA claims, while not adopting a specific number of guideline factors such as the 10-item Kansas list, resolve the issue on terms similar to the "ultimate test" identified in *Doughty*: whether the entities have failed to maintain formal corporate distinctions, or whether recognition of the entities as distinct would allow them some unfair advantage. *Melko v. Dionisio*, 219 Ill. App. 3d 1048, 1063-64 (1991); *Hopgood v. Anheuser-Busch, Inc.*, 120 Ill. App. 3d 222, 227-28 (1983). We believe that the evidence presented by Larson in support of his claims of alter ego liability is no more suggestive of the absence of corporate distinction or of unfair advantage than that advanced by the *Doughty* plaintiff.

Larson makes much of the fact that his supervisor, B.J. Mackey, reported to James Crisp, a FGE employee who reported to a CSXT vice president. But such limited structural overlap is insufficient to require submission of the alter ego issue to the jury. *Hopgood*, at 120 Ill. App. 3d at 227. Larson's demonstration that his paycheck, one of the trucks he used, and the credit cards assigned to the trucks displayed CSXT emblems cannot be considered evidence that FGE was undercapitalized or that the companies ignored corporate formalities, especially in light of unrebutted evidence that FGE purchased payroll services from CSXT, leased vehicles from CSXT, and accounted for all credit card expenses from its own funds. Larson has offered no evidence that FGE was not operated on a stand-alone basis, that its management worked for interests other than its own, or that any of the coordination between FGE and CSXT was the result of anything other than an arm's-length exchange of services which furthered the independent goals of FGE. In summary, Larson has failed to produce evidence upon which a jury could base a conclusion that CSXT and FGE failed to operate as separate entities, or that their recognition as such would result in an injustice.

## CONCLUSION

Because the record does not show that there is any genuine issue of material fact that Larson is either a borrowed or dual servant, or that FGE is a subservant or alter ego of CSXT, we affirm the order of the circuit court of Cook County granting summary judgment for defendant CSXT.

Affirmed.

TULLY and O'MARA FROSSARD, JJ., concur.